## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Luis Suarez, Task Force Officer with Homeland Security Investigations, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residents known as 5544 S. Morris Cir., Tucson, AZ, hereinafter "**TARGET RESIDENCE**," further described in Attachment A, for the things described in Attachment B.

2. I, Luis Suarez, your affiant, is an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. Your Affiant is cross designated by the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI), who is empowered by the Drug Enforcement Administration (DEA), by law, to conduct investigations of, and to make arrests for, offenses enumerated under Title 21 U.S.C.

3. Your Affiant is a Customs and Border Protection (CBP) Task Force Officer with HSI and has worked in this position since March of 2025. Your Affiant is assigned to the Assistant Special Agent in Charge (ASAC), Nogales, Arizona office.

4. As a Task Force Officer with HSI, Your Affiant is responsible for investigating and enforcing violations of federal law to include the enforcement of controlled substances, immigration, money laundering, and various Customs violations.

5. In addition to Your Affiant's experience as a Task Force Officer with HSI, I have been a CBPO officer for six years, serving the U.S/Mexico border in Nogales, AZ. During this time, I conducted criminal investigations of violations of import/exportations laws, specifically the importing of illegal substances and the exportation of firearms. Prior to becoming a CBP officer, I served eight years in the U.S. Army and practiced Human Intelligence Collection.

1

6. Your Affiant graduated the Customs and Border Protection Officer Basic Training program at the Federal Law Enforcement Training Center, in May 2019. There, I received specialized training to include, but not limited to the following federal criminal investigations: drug smuggling, human smuggling/trafficking, money laundering, firearms violations, and import/export violations. I also received specialized training to include, but not limited to the operational aspects of drug trafficking and other criminal organizations, law enforcement operations/tactics and surveillance. By virtue of Your Affiant's employment as a CBP officer, Your Affiant has performed various tasks, which include, but are not limited to: (a) functioning as a surveillance officer, thus observing and recording movements of persons trafficking in drugs/bulk illicit cash and those suspected of trafficking in drugs/bulk illicit cash; (b) interviewing witnesses, and sources of information ("SOIs") relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (to include the laundering of drug-trafficking proceeds); and (c) functioning as a case agent, entailing the supervision of specific investigations involving the trafficking of drugs.

7. Through the course of conducting drug/currency investigations, Your Affiant has personally helped to interview persons involved in the distribution of illegal drugs. Your Affiant has consulted with other experienced investigators concerning the practices of drug traffickers and the best methods of investigating them. In preparing this Affidavit, Your Affiant has conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, Your Affiant has personal knowledge of the following facts or have learned them from the individuals mentioned herein.

**BACKGROUND ON DRUG TRAFFICKERS**

8. During my employment, I have learned that individuals involved in the transportation of narcotics often do the following:

2

a. frequently maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing illicit business; the sale of controlled substances generates large quantities of U.S. currency in small denominations;

b. maintain books, records, notes, ledgers, airline tickets, and receipts relating to the purchase of financial instruments and/or the transportation, ordering, sale, and distribution of controlled substances; and that the aforementioned books, records, receipts, notes, ledgers, etc., are maintained for extended periods of time at a place where traffickers have ready access to them;

c. communicate with each other via cellular phones when transporting narcotics across the international border and through southern Arizona until the narcotics' final destination is reached; particularly to transportation cells, they use cellular phones to communicate between load coordinators, scouts, load drivers, and the distribution cells that will obtain the controlled substance for further distribution within the United States;

   i. your affiant has witnessed load coordinators purchase disposable cellular phones in order to communicate with the load driver; furthermore, it is not uncommon for load drivers to be instructed to use only the disposable phone provided to communicate with the transportation cell;

   ii. additionally, when these phones are provided to the load drivers, there are usually multiple pre-programmed numbers that the driver will use to communicate with other members of the transportation cell; during the transportation of the controlled substance, the scouts are often in frequent visual proximity to the controlled substance load vehicle which enables the scouts to report back by cellular phone to their bosses in the event the load is interdicted by law enforcement; if the load is interdicted by law enforcement, the scouts will cease all cellular communication with the phone provided to the load driver to divert the focus away from the phone; also, during the transportation it is not uncommon for the load coordinator to communicate with the suppliers of the controlled substance;

   iii. the communication occurs so that each member is aware of the progress of the controlled substance transportation event and to ultimately communicate the destination to the load drivers, only when they are close to their drop-off destination. I am aware that as the load nears landmarks, such as Border Patrol checkpoints or closer to a city, the load coordinator must be in phone contact with the recipient of the

3

      narcotics to arrange for the drop-off location of the load vehicle; once a drop-off location is established, the load coordinator must then communicate with the load driver to provide further instruction as to where the vehicle must be dropped off; the drop-off location is usually a public parking lot where the vehicle will be left with the keys inside for the recipient of the load to pick up the loaded vehicle; the vehicle is then often taken to another location where the controlled substances are unloaded and the empty vehicle is then returned to the driver; however, the return location of the empty vehicle is often different than the original drop-off location; the new location is provided via phone contact to the load coordinator; and the load coordinator then communicates the information to the driver;

   iv.   the phone communication helps the transportation organization compartmentalize information and avoid detection and identification of its members;

   v.   in addition to the call records, contacts lists, and text messages providing useful information, your affiant has personally witnessed incriminating information stored in the memory of the cellular phone; for example, your affiant has seen stored photographs in cellular phones of bulk currency, narcotics, and load/scout vehicles that include their license plates; additionally, certain cellular phones ("smart phones") often are capable of browsing the internet and of providing navigation assistance via turn-by-turn directions and maps.

d. hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their vehicles, their business, or other locations over which they maintain dominion and control, such as "stash houses" (i.e., properties whose primary and often sole purpose is to store narcotics for further distribution throughout the United States), for ready access and to conceal these items from law enforcement authorities;

e. maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit keys, and money wrappers; traffickers maintain these items within their residences, in safes, vehicles, businesses, or other locations over which they maintain dominion and control;

4

f.  utilize electronic equipment such as computers, digital pagers, telex machines, facsimile machines, cellular telephones, electronic voicemail, and telephone answering machines to generate, transfer, count, record, and/or store drug related information or information related to drug proceeds;

g.  when drug traffickers amass large amounts of proceeds from the sale of drugs, attempt to legitimize these profits through money laundering activities and businesses; to accomplish these goals, drug traffickers utilize, among other things: domestic and international banks and their attendant services; securities brokers; professionals, such as attorneys and accountants; casinos; real estate; shell corporations and business fronts; and otherwise legitimate businesses that generate large quantities of currency;

h.  physically handle and count the monies after receiving it in exchange for the narcotics, thereby leaving residue traces of controlled substances on the monies;

i.  maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

j.  take, or cause to be taken, photographs and videos of themselves, their associates, their property and their product; that these drug traffickers usually maintain these photographs within their possession, in their residences, vehicles, businesses, or other locations over which they maintain dominion and control;

k.  in the course of money laundering, register multiple businesses that deal in cash transactions in order to filter the illegal proceeds; oftentimes, these businesses are listed to drop boxes, and the businesses themselves do not have a physical address;

l.  purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities, to avoid detection of these assets by law enforcement agencies; and, although these assets are in other names, traffickers actually own and continue to use these assets and exercise dominion and control over them; and

m.  maintain, use, or employ firearms in connection with their controlled substance trafficking activities.

9. For the reasons detailed below, I believe that there is probable cause to that the **TARGET RESIDENCE** contains evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841, 846, 952, 960, and/or 963.

10. Therefore, your affiant respectfully requests that a warrant be issued to allow any authorized law enforcement officer to enter, with proper assistance, the **TARGET RESIDENCE** described in Attachment A. The premise in Attachment A is believed to be a single-story residence being used to stash/store narcotics and that contain indicia of drug trafficking. Authorization is sought to search this premise for items contained in Attachment B.

11. Based on the above information, it is requested that all vehicles, trailers, or other structures and/or storage facilities located on the **TARGET RESIDENCE** described in Attachment A, which could be used to conceal those items listed in Attachment B, be included in the search.

## PROBABLE CAUSE

12. Your Affiant states the following facts are known to him personally, and by information and belief, in support of this application for a search warrant:

13. Information about the **TARGET RESIDENCE** was acquired during an interview with Brayan Alejandro Iniguez in the early morning hours of May 15, 2025, at the Mariposa Port of Entry (POE) in Nogales, AZ after Iniguez attempted to enter the U.S.

14. At approximately 2120 hours on May 14, 2025, Iniguez, a United States citizen (USC), date of birth (DOB) 01/08/2006, attempted to enter the U.S. through the vehicle lane at the Mariposa Port of Entry (POE) in Nogales, AZ. Upon driving to the primary booth, CBP primary officers referred Iniguez to secondary inspection based upon Iniguez displaying nervous behavior. An X-ray scan was utilized on the vehicle being driven by Iniguez. This X-ray scan revealed anomalies within musical

6

instruments, multiple speaker boxes and a turntable, located in the trunk and backseat of the vehicle. A further inspection revealed packages hidden inside of the instruments and speaker boxes. The packages contained blue pills, weighing 55 kgs (121.25lbs), that tested positive for fentanyl.

15. During a post-*Miranda* interview, Iniguez told agents that he had knowingly transported an unspecified type and quantity of narcotics from Mexico (MX) to Tucson, AZ, on two other occasions: once on May 12, 2025, and the other on May 13, 2025, at the behest of "Rico Muerto," an individual believed to be based in Mexico, based upon his current WhatsApp phone number. Iniguez told agents that he dropped the narcotics off at the **TARGET** RESIDENCE on both prior occasions. Then, on May 15, 2025, Iniguez intended to deliver narcotics, for a third time, to the **TARGET RESIDENCE**. Iniguez was to be paid $250 - $300 USD by a contact he knew as "Tia" upon a successful delivery on May 14, 2025. At first, Iniguez claimed he did not know he was transporting narcotics and said he was renting the musical equipment to "Tia" for a party. Iniguez consistently changed his story before admitting that he did in fact know drugs were hidden in the music instruments. He also told agents that while he knew there were drugs, he was not sure on the type of narcotic.

16. Iniguez provided further context, stating on May 12, 2025, he smuggled narcotics via body carry through the port of entry in Nogales, AZ, and then drove with the narcotics strapped to his body from Nogales to **TARGET RESIDENCE**. Iniguez then successfully delivered the narcotics to an unidentified individual at the **TARGET RESIDENCE**. Iniguez explained that the narcotics he smuggled on May 13, 2025, were concealed in the same musical instruments used on May 14, 2025. He also provided a photograph from May 13, 2025, of an unidentified individual moving one of the speaker boxes used to smuggle narcotics from Iniguez's vehicle towards the **TARGET RESIDENCE**. The individual then entered the front door of the residence carrying the speaker box. Iniguez also stated he did not know the owner of the **TARGET RESIDENCE**. In my experience, I have learned it is not

7

17. an uncommon operating procedure for criminal organizations to compartmentalize individual facets of the drug trafficking operation from various co-conspirators.

17. A review of law enforcement databases revealed the current utilities owner of the **TARGET RESIDENCE** was Francisco Contreras Estrada, DOB 01/09/1995. Estrada was a subject of investigation in 2014 for being an associate of two narcotics smugglers. Several other individuals also have this address registered with Arizona Motor Vehicle Division as their residence, all of whom had no criminal record and no direct affiliation with Iniguez. Agents have also observed there are two vehicles present at the **TARGET RESIDENCE:** one Nissan 370Z bearing Washington (WA) license plate CHT6247, registered to Emily Zepeda Beltran and Eutiquio Diaz Leal, both of whom have addresses in WA. The other vehicle is a Ford Mustang bearing AZ license plate RONDAWG, registered to Efren Estrada, a current resident of the **TARGET RESIDENCE**.

18. HSI has maintained constant surveillance of the **TARGET RESIDENCE** since 0900 on May 15, 2025, and there have been no changes in the residence observed, and no parties have entered or exited the residence.

/ / /

## CONCLUSION

19. For the reasons set forth above, I respectfully submit there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 841 and 846 at the **TARGET RESIDENCE.** I further submit that there is probable cause to believe that evidence of these crimes, as more particularly described in Attachment B, will be found at the **TARGET RESIDENCE** described in Attachment A hereto. Accordingly, I hereby request that the Court issue a warrant to search the **TARGET RESIDENCE.**

I swear under penalty of perjury, that the foregoing is true and correct,

LUIS J SUAREZ
Digitally signed by LUIS J SUAREZ
Date: 2025.05.15 14:20:40 -07'00'

Luis Suarez, Task Force Officer
Homeland Security Investigations

Sworn and subscribed to telephonically this 15 day of May 2025.

The Honorable Michael A. Ambri
United States Magistrate Judge